UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW KROPP,<br><br>    Plaintiff,<br><br>    v.<br><br>JEFFERY SCOTT,<br><br>    Defendant. | Case No. 18-cv-01549-SI<br><br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 30, 37 |

This is a *pro se* prisoner's civil rights action under 42 U.S.C. § 1983 in which Matthew Kropp alleges that correctional officer Jeffrey Scott subjected him to cruel and unusual punishment by shooting him when he was fighting with other inmates. Defendant now moves for summary judgment on the merits of Kropp's claim and on the defense of qualified immunity. Kropp does not oppose the motion. For the reasons discussed below, defendant's motion for summary judgment will be granted and judgment will be entered in his favor.

**BACKGROUND**

The following facts are undisputed unless otherwise noted:

The events and omissions giving rise to the complaint occurred on the Facility A yard at Pelican Bay State Prison, a maximum-security prison, on March 9, 2017. The Facility A yard has an upper yard and a lower yard, separated by a fence with a gate. On the relevant date, plaintiff Matthew Kropp was a prisoner, and defendant Jeffrey Scott was a correctional officer, at Pelican Bay. Docket No. 1 at 2.

The CDCR's use-of-force policy, as relevant here, states that "deadly force will only be used when it is reasonably necessary to . . . [d]efend the employee or other persons from an imminent

threat of death or great bodily injury." 15 Cal. Code Regs. § 3268(d)(1).

A.  A Violent Morning on the Facility A Yard

The fight Kropp engaged in was the second fight on the yard that morning and followed quickly after a first fight was underway. The first fight began at about 9:12 a.m. on the lower yard when inmates Sanchez, Aranda, and Chacon attacked inmate Galvan. The three attacking inmates beat and stabbed inmate Galvan, who attempted to shield himself from the attack. Galvan later died from his injuries.

The Facility A yard observation tower issued an order for all inmates on the yard to get down. The fighting inmates did not comply, although other inmates did get down as ordered. Several officers stationed on the yard responded, deploying grenades of chemical agents toward the fighting inmates. The first grenade landed within about 10 feet of the fight but had no apparent effect on the fighting inmates. The next two grenades landed within a couple of feet of the fighting inmates and had an effect; the inmates dispersed and assumed prone positions on the ground.

Within a couple of minutes after the first fight started in the lower yard, another fight erupted on the upper yard. The parties disagree as to the particulars of that second fight, which was captured on video recordings.

B.  The Video Evidence

Defendant Scott submitted a CD with video footage of the Facility A yard from three camera locations, two of which captured the fight in which Kropp was engaged. The video quality is not particularly good and there is no sound track. It may have been raining that morning as the yard appears to have puddles in several locations and some of the inmates were wearing long yellow raincoats. The parties agree that Kropp abruptly was thrown backwards from the fight when he was hit by the first shot fired by Scott; using that information, one can see Kropp's role in the fight.

The video excerpt marked "CH 4" shows Kropp's fight at the left edge of the frame. The fight is already underway when the inmates first appear onscreen. Two inmates in white t-shirts are beating another inmate in a yellow coat who is on the ground. (Kropp was later identified as one of

2

the inmates in the white t-shirts.) One inmate in a white t-shirt is standing and punching the inmate in the yellow coat; the other inmate in a white t-shirt is kneeling and punching the inmate in the yellow coat. The inmate in the yellow coat does not appear to throw any punches. The attack by the two inmates in white t-shirts continues for about 47 seconds until one of those two inmates abruptly moves backwards away from the fight and falls to the ground a few feet away. The other inmate in the white t-shirt continues punching the inmate in the yellow coat for a few more seconds until the attacking inmate lies down when correctional officers show up and a cloud of smoke erupts in the area. Within a couple of minutes, several people carrying equipment bags run over to the area and go to the man who had been thrown backwards away from the fight. Two other people arrive with a gurney.

The video excerpt marked "CH 2" appears to show the first fight, and then the camera pans over to the second fight, just as correctional staff and a puff of smoke (as from a grenade) arrive at the scene. This video also shows the staff members approaching with equipment bags and two people bringing a gurney. The video also shows the inmate in the yellow raincoat being escorted away from the scene by correctional staff.

C. <u>Kropp's Version</u>

According to Kropp, he was standing in line waiting to use a urinal when he felt someone hit him from behind. Kropp "fell to the ground and immediately got back to his feet and started to defend himself by throwing closed fist punches at (2) inmates he felt were attacking him. All (3) inmates were exchanging closed fist punches in this incident mutually" that did not involve weapons. Docket No. 1 at 3-4; *see also id.* at 9 ("all inmates involved exchanged mutual closed fist punches"). Suddenly, Kropp "heard a loud noise and felt something very powerful hit him. He was immediately thrown back at least 10-12 feet from the other (2) inmates." *Id.* at 4. While on the ground, he heard another loud noise and felt something powerful hit him once again. Several correctional officers arrived and one of them informed Kropp he had been shot. *Id.* Kropp later learned that Scott was the officer who shot him two times "in short succession[]." *Id.* One shot hit Kropp in the shoulder and the other hit him in his right arm, shattering his humerus, before entering

3

his right side, where it remains today. *Id.* at 5. He required emergency surgery to repair an artery and to address the fracture in his right arm.

Kropp testified at his deposition that he did not hear an order to get down because he was "zoned in and trying to defend" himself. *Id.* at 3. Kropp also testified that, in most fights, "you are going to keep defending yourself until someone comes and breaks it up." *Id.* at 6. And he testified that he in fact continued to fight until he was shot. *Id.* at 5.

D. <u>Scott's Version</u>

Correctional officer (C/O) Scott was at the time assigned to provide gun coverage for the upper yard. His duties in that position included monitoring activity on the yard, notifying yard officers of any improper or suspicious activity, and ensuring that inmates complied with prison rules and regulations. C/O Scott had access to the public address system for Facility A. Scott's gun post was one of eight gun posts that provided cover for the Facility A yard. Docket No. 30-6 at 2.

At about 9:15 a.m., C/O Scott heard staff yelling orders to "'get down.'" *Id.* According to Scott, correctional staff will order inmates to get down when they observe inmates fighting or attacking other inmates or staff. *Id.* When a staff member shouts an order to get down, inmates are expected to immediately stop what they are doing and lay face down on the ground. This is done to attempt to get fighting inmates to stop before the use of force becomes necessary and to protect uninvolved inmates by allowing officers to distinguish between the involved and uninvolved inmates. *Id.*

When C/O Scott heard the orders to "get down," he scanned the yard and noticed that most of the inmates on the lower yard had complied with the orders, although there were some inmates fighting on the lower yard and staff responding to that first fight. *Id.* About 30 seconds later, he noticed three inmates fighting on the upper yard. Two inmates, later identified as Kropp and Razo, were attacking inmate Ojeda. "Ojeda was lying on the ground, appearing unresponsive, and not defending himself. Kropp and Razo were striking Ojeda in the head and torso with closed fists." *Id.* C/O Scott observed that the yard officers were about 100 to 150 feet away from this second fight and had not yet noticed it. *Id.* Using the public address system, C/O Scott ordered Kropp and Razo

4

to get down, but they ignored his orders. After 15-20 seconds, ground staff were not responding to this fight because they were focused on the first fight in the lower yard. *Id.*

Based on his training and experience, C/O Scott thought the situation met the CDCR's criteria for the application of deadly force. *Id.* "Ojeda was lying motionless on the ground and it appeared to [C/O Scott] that Kropp and Razo would cause death or great bodily injury to Ojeda if their attack was not stopped." *Id.* In the control booth, C/O Scott had access to "an exact impact round 40mm launcher," which has a round covered by a sponge tip and is designated as a less lethal round, but has a maximum effective range of 105 feet, just over half the distance to the inmates engaged in the second fight about 200 feet away from him. *Id.* at 3. Scott also had access to a "state-owned Ruger Mini 14 rifle," which he chose to use. *Id.*

C/O Scott fired the Ruger Mini 14 rifle at Kropp, and the round had an immediate effect: Kropp ceased his attack on Ojeda and rolled away. C/O Scott observed that Razo continued his attack by punching Ojeda's head and body, and that Ojeda did not appear to fight back. *Id.* C/O Scott scanned the yard for responding staff and saw that none had yet arrived. He then "aimed the rifle at Razo, and fired one round. [Scott] did not see where this round hit, but it appeared to [him] that the shot had the desired effect on Razo, because he moved away from Ojeda and lay in a prone position on the ground." *Id.* The second shot did not hit Razo, however. Responding staff arrived and took over the incident.

One correctional officer (Maylin) ran from the first fight to the second fight, but had to run through a vehicle gate in the middle of the fence that separated the upper and lower yards to get to the second incident. When he arrived, he tossed an oleoresin capsicum grenade from about ten feet away, but Razo continued his attack on Ojeda. Another correctional officer (Powers) responded to the scene and struck Razo in the upper back area with his baton. Razo finally stopped his attack and got down on the ground in a prone position.

E. <u>Disciplinary Proceedings</u>

A rule violation report for the fight was issued to Kropp. At the disciplinary hearing, he was found guilty of battery on an inmate resulting in serious bodily injury. For discipline, he was

5

assessed a forfeiture of 360 days of time credits. Because Kropp is serving a determinate 15-year prison sentence, the loss of time credits will affect the duration of his stay in prison.

**LEGAL STANDARD FOR SUMMARY JUDGMENT**

Summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine dispute as to any material fact and [that] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Generally, the moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings and by [his or her] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (citations omitted).

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. *See Schroeder v. McDonald,* 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge). Here, Kropp's complaint was signed under penalty of perjury and the facts therein are considered as evidence for purposes of deciding the motion.

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id*. at 631.

**DISCUSSION**

A. <u>The Video Evidence Undermines Kropp's Version Of The Fight</u>

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380-83 (2007) (police officer entitled to summary judgment based on qualified immunity in light of video evidence capturing plaintiff's reckless driving in attempting to evade capture which utterly discredits plaintiff's claim that there was little or no actual threat to innocent bystanders); *cf. Cruz v. City of Anaheim*, 765 F.3d 1076, 1080 (9th Cir. 2014) (police officers not entitled to summary judgment in a fatal shooting that involved "curious and material factual discrepancies," including the fact that the victim did not have a gun on him and was still suspended by his seat belt when he was shot, which is inconsistent with the officers' assertion that they saw the victim reach for a gun; based on these disputed facts, it was for a jury to decide whether or not to believe the testimony of the four shooting officers and to consider other circumstantial evidence that would tend to discredit their version of events).

This is a case in which the video recordings blatantly contradict Kropp's version of events. Mindful that the *Scott* rule is to be used with great caution, the court believes that this is an appropriate case in which to use it because the video tells a story wholly at odds with the version Kropp offers. Although the video is not a perfect record because the footage is grainy and does not capture the very beginning of the fight, the video has some very critical information. The video plainly shows that this was not the "mutual fist fight" that Kropp describes and plainly shows that he was not being attacked. For at least 47 seconds, Kropp and Razo were hitting the victim in the

7

1 head and torso area, all while the victim was lying on the ground and not appearing to throw any punches. The video also plainly shows that Kropp was making large side-to-side swinging motions with his punches – in boxing parlance, they were haymakers and not jabs – and kept doing so right up until he was abruptly thrown backwards to the ground. The parties agree that he was thrown backwards by the force of the first gunshot that hit him. In light of the video evidence that contradicts Kropp's version, for purposes of ruling on the motion for summary judgment, the court does not accept as true Kropp's version that he was engaged in a mutual fist fight and does not accept as true Kropp's version that he was being attacked by two inmates.

B.      Eighth Amendment Claim

The unnecessary and wanton infliction of pain on a prisoner amounts to cruel and unusual punishment prohibited by the Eight Amendment. *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). "The infliction of pain in the course of a prison security measure, therefore, does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." *Whitley*, 475 U.S. at 319. The extent of injury suffered by the inmate is a factor to consider in determining whether the force is excessive, although the absence of serious injury does not necessarily mean that the force was not excessive. *See Hudson*, 503 U.S. at 7. Other factors to consider to determine whether the force is excessive include evaluating "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* at 7-8 (quoting *Whitley*, 475 U.S. at 321). Applying these criteria to the evidence in the record leads to the conclusion that C/O Scott's use of force was a good-faith effort to restore discipline.

8

There was an "objective need for force." *Marquez v. Gutierrez*, 322 F.3d 689, 692 (9th Cir. 2003) (citing *Whitley*). Viewing the evidence in the record in the light most favorable to Kropp (except for his statements that he was engaged in a mutual fist fight and was being attacked), the evidence shows the following: (a) Kropp and Razo punched Ojeda in the torso and head for at least 47 seconds; (b) during that time, Ojeda lay on the ground and did not throw any visible punches, (c) Kropp did not stop punching Ojeda until Kropp was hit by the first gunshot; and (d) Kropp was not being punched by Ojeda in the 47 seconds before Kropp was shot.

The "threat reasonably perceived by the correctional officer," *id.*, was great. It is undisputed that it appeared to C/O Scott that Ojeda was unconscious and defenseless, and was being hit in the head and torso repeatedly by Kropp and Razo for at least 47 seconds. On this record, any reasonable trier of fact would find that Ojeda reasonably appeared to be at risk of great bodily injury or death.

Efforts were taken to "temper the severity" of the response to Kropp's fight. *Id.* Correctional staff shouted orders for all inmates to "get down" when the first fight broke out. Kropp disobeyed those orders. Additionally, before he fired a shot, C/O Scott gave orders over the public address system for Kropp and Razo to get down, but neither inmate complied with those orders. Kropp did not hear the order because he was "zoned in" on the fight and concedes that inmates usually do not stop fighting until someone stops them. Docket No. 30-9 at 3, 6. The undisputed evidence shows that C/O Scott did not use the less-lethal exact impact round 40 mm launcher that was available to him, but it also is undisputed that the launcher would have been ineffectual because it did not have a long enough range to reach the fighting inmates. There is no evidence that C/O Scott had any other reasonably available force to use to stop the fight other than the Ruger mini-14 rifle. His options were limited because he was in a gun tower about 200 feet away when he first saw Kropp and Razo beating the seemingly defenseless inmate. Had he run to the scene (assuming that abandonment of his post was allowed), great bodily injury or death could have been inflicted before he arrived. Had he done nothing but call out orders, the victim could have sustained great bodily injury or death, as the attackers showed no signs of slowing down until shots were fired. Before he shot Kropp, C/O Scott saw that the other correctional staff were not responding to Kropp's fight because they were focused on responding to the simultaneously occurring fight in the lower yard.

The "relationship between any [need for force] and the amount of force actually used," *Marquez*, 322 F.3d at 692, also favors a finding that the force used was not inflicted maliciously and sadistically for the very purpose of causing harm. Kropp undeniably was subjected to great force when he was shot twice. One round went into the shoulder and the other round went through his arm, breaking a bone, and then lodging in his torso. There also was a great need for the use of force. As mentioned above, the evidence shows that Kropp and Razo were beating an apparently-unconscious and defenseless inmate, striking him in the head and torso, and that they continued to do so for 47 seconds despite commands for them to get down on the ground. The scenario suggested to C/O Scott that the victim would sustain great bodily injury or death if force was not used to immediately stop the attack. C/O Scott fired two shots: the first shot that hit Kropp caused him to stop his attack and the second shot that hit Kropp was aimed at Razo, who was still attacking the victim. The force used met the CDCR's criteria for the application of deadly force, *see* Cal. Code Regs. tit. 15, § 3268, which tends to show its reasonableness.

Scott urges in his complaint that the second shot that hit him amounted to excessive force because he was already several feet away from the fight and lying on the ground when the second shot was fired. His contention is unpersuasive because the undisputed evidence shows that C/O Scott's second shot was aimed at Razo, who at that moment was continuing to attack Ojeda. For the same reasons that lead to the conclusion that firing the first shot at Kropp while he was attacking Ojeda was not excessive force, shooting at Razo while he (Razo) was attacking Ojeda did not amount to excessive force. *See Robins v. Meecham*, 60 F.3d 1436, 1439-41 (9th Cir. 1995) (summary judgment properly denied for defendants in case where bystander-inmate was hit by ricocheting birdshot fired at another inmate because there was a triable issue of fact as to whether the force used against the target inmate, who reportedly was trying to comply with orders, was necessary to restore discipline). Because shooting at the attacking Razo did not amount to excessive force, Kropp cannot maintain an Eighth Amendment claim based on the fact that he was accidentally hit by that shot.

On the evidence in the record, no reasonable factfinder could find that C/O Scott shot Kropp "maliciously and sadistically to cause harm" rather than "in a good-faith effort to maintain or restore

10

discipline." *Hudson*, 503 U.S. at 6-7. Scott therefore is entitled to judgment as a matter of law on the Eighth Amendment claim.

C. <u>Qualified Immunity Defense</u>

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The doctrine of qualified immunity attempts to balance two important and sometimes competing interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine thus intends to take into account the real-world demands on officials in order to allow them to act "swiftly and firmly" in situations where the rules governing their actions are often "voluminous, ambiguous, and contradictory." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009) (citation omitted). "The purpose of this doctrine is to recognize that holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations, thus disrupting the effective performance of their public duties." *Id.*

To determine whether an official is entitled to qualified immunity, the court must decide whether the facts alleged show the official's conduct violated a constitutional right; and, if so, whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001); *see also Pearson v. Callahan*, 555 U.S. 223 (2009) (overruling *Saucier*'s requirement that qualified immunity analysis proceed in a particular sequence). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201.

Here, Scott prevails on the first prong of the *Saucier* test because there was not a violation of Kropp's Eighth Amendment right to be free from cruel and unusual punishment. *See Saucier*, 533 U.S. at 201 (threshold question in qualified immunity analysis is: "Taken in the light most

11

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"). Even assuming arguendo that there was an Eighth Amendment violation in shooting rounds to stop a fight among unarmed inmates, Scott would prevail at the second prong of the qualified immunity test because it would not have been clear to a reasonable official in his position that shooting inmates attacking an inmate lying on the ground was unlawful.

The Ninth Circuit case of *Marquez v. Gutierrez*, 322 F.3d 689, 693 (9th Cir. 2003), is quite instructive as it found a shooting guard to have qualified immunity on quite similar facts. There, Marquez claimed that he was attacked by a group of unarmed inmates but took no violent action himself. *Id.* at 691. Meanwhile, inmate Perez ended up lying on the ground three feet away attempting to defend himself while being kicked in the head by two more inmates. *Id.* A guard named Gutierrez, stationed in a guard tower about 360 feet way, yelled for the prisoners on the yard to get down, but none of the combatants complied with his order or a similar order made by another officer. Gutierrez said he saw Perez lying on the ground being kicked in the head and that one of the two kicking inmates was Marquez; after shouting "get down" did not stop the attacking inmates, Gutierrez shot Marquez in the leg, causing serious injuries. *Id.* The Ninth Circuit held that, on Marquez's version of the facts, an Eighth Amendment violation occurred because it would be the infliction of unnecessary and wanton pain to "shoot a passive, unarmed inmate standing near a fight between other inmates, none of whom was armed, when no inmate was in danger of great bodily harm." *Id.* at 692. Notwithstanding the triable issue as to whether his decision to shoot Marquez was malicious, Gutierrez was entitled to qualified immunity. *Id.*

> Even if Gutierrez's beliefs that Marquez was involved in the kicking incident and that Perez was in danger of serious harm were mistaken, he can still be entitled to qualified immunity. A reasonable official standing where Gutierrez was standing—that is, in a tower located 360 feet away from the disturbance—could perceive that both Marquez and another inmate were kicking Perez and threatening Perez with serious injury or death, and that Perez was not capable of protecting himself, even if no kick was actually administered by Marquez. The scenario may look different when gauged against the "20/20 vision of hindsight," but we must look at the situation as a reasonable officer in Gutierrez's position could have perceived it. In that light, we believe that a reasonable officer could believe that shooting one inmate in the leg to stop an assault that could have seriously injured or killed another inmate was a good faith effort to restore order, and thus lawful.

322 F.3d at 693 (citing *Saucier*, 530 U.S. at 205).

Similarly, a reasonable official in C/O Scott's place – in a gun tower 200 feet from the scene of a fight—could perceive that two inmates were threatening a third inmate with serious injury or death by punching him repeatedly in the head and torso, and that the third inmate was not capable of protecting himself. In those circumstances, a reasonable officer could believe that shooting at the attacking inmates to stop the assault was a good faith effort to restore order, and thus lawful. This also means that, even if one accepts as true Kropp's statement that he was being attacked rather than attacking – a version contradicted by the video evidence -- C/O Scott would be entitled to qualified immunity as a reasonable official could have thought shooting the attacking inmates was lawful, even if the shot accidentally hit the victim rather than an attacker. C/O Scott thus is entitled to qualified immunity against the Eighth Amendment claim.

Having determined that defendant prevails on the merits of the Eighth Amendment claim and the defense of qualified immunity, the court does not reach defendant's argument that the claim is barred by the rule from *Heck v. Humphrey*, 512 U.S. 477 (1994).

In a request dated September 7, 2019, Kropp asked for a 60-day extension of the deadline to oppose the motion for summary judgment. Kropp stated that he did not have his personal property because he had been placed in ad-seg on August 30, and therefore could not "craft" an opposition. Docket No. 37 at 3. When the court earlier extended the deadline to August 19, 2019, the court cautioned Kropp that "[n]o further extensions of this deadline should be expected." Docket No. 36. That was reasonable because the August 19 deadline gave Kropp six months to prepare his opposition. Kropp has not shown good cause to further extend the deadline. His request was not filed until about three weeks after the already-extended deadline had passed. His placement in ad-seg does not explain why he could not and did not file the opposition by the deadline because he was not put in ad-seg until about 11 days after the deadline had passed. His request also indicates that he has not even begun to prepare his opposition, as he needs 60 extra days to prepare it. For these reasons, the request to further extend the deadline for an opposition is DENIED. Docket No. 37.

**CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED. Docket. No. 30. Defendant is entitled to judgment as a matter of law in his favor on the merits of plaintiff's Eighth Amendment claim and on the defense of qualified immunity. Having rejected the federal claim for relief that gave the Court federal question jurisdiction, the Court declines to exercise supplemental jurisdiction over any state law claim. *See* 28 U.S.C. § 1367(c)(3).

The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: September 23, 2019

_____
SUSAN ILLSTON
United States District Judge